## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| STEPHEN J. PINKNEY, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 1:07-CV-186 |
| | ) | |
| v. | ) | |
| | ) | |
| OFFICER WILLIAM THOMAS, | ) | |
| RALPH PECONGE, and | ) | |
| CITY OF FORT WAYNE | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

## I.  INTRODUCTION

Stephen J. Pinkney is suing William Thomas, a Fort Wayne police officer, and Ralph Peconge, a Fort Wayne Community Schools ("FWCS") security guard, in their individual capacities, alleging they used excessive force during his arrest on October 6, 2006.  Concerning Peconge, Pinkney alleges an Indiana tort claim of battery, as well as a 42 U.S.C. §1983 claim that Peconge used unreasonable force in concert with Thomas or that Peconge should have stopped Thomas from repeatedly hitting him.  Peconge has filed a motion for summary judgment (Docket # 20) and a motion to strike statements in Pinkney's affidavit (Docket # 31), which are now before the Court.

The motion for summary judgment (Docket # 20) is limited to the argument that there is no evidence to support either the state law or § 1983 claims against Peconge.  In particular, Peconge maintains that Pinkney's evidence does not make out a battery claim because the physical contact between the two was lawful, and besides, Peconge is entitled to immunity under Indiana's Tort Claims Act, Ind. Code § 34-13-3 *et seq.*  As for the §1983 claim, that too fails in

Peconge's view because he had no advance knowledge that Thomas would strike Pinkney; and furthermore, he had no opportunity to stop Thomas from doing so. Despite these contentions, the motion for summary judgment (Docket # 20) will be DENIED.

Peconge's motion to strike (Docket # 31) seeks to strike paragraph 10 and parts of paragraphs 12, 13 and 14 of Pinkney's affidavit offered in opposition to the motion for summary judgment. The Court, however, considers the motion moot because Peconge's motion for summary judgment fails even if we exclude those statements.

## II. FACTUAL BACKGROUND

Although Peconge is a full-time Fort Wayne firefighter, on Wednesday, October 4, 2006, he was working as a part-time security guard for Fort Wayne Community Schools at Weisser Park Elementary School. (Peconge Aff. ¶¶ 2-6, Exs. A, B.) At that job, he was responsible for the safety and security of the school's students, staff, patrons, visitors, and public and private property, as well as the enforcement of "all federal, state, and local laws" in addition to the rules and regulations of Fort Wayne Community Schools. (*See* Weicker Aff. ¶¶ 2-7, Ex. A; Sleet Aff. ¶¶ 2-6.)

While working at the school on the morning of October 4, Peconge received a call over his two-way radio from a secretary in the school's office, reporting that kids were fighting in the front of the school. (Peconge Aff. ¶ 7.) Peconge immediately headed there and saw Pinkney, who he did not know at the time, and another man standing near a car. (Peconge Aff. ¶ 8.) The other man had a stick or a bat in his hand, and when he saw Peconge, he got into the car and drove off, leaving Pinkney standing at the curb. (Peconge Aff. ¶ 9-10.) Peconge approached Pinkney and asked him, "[W]hat's going on?" (Peconge Aff. ¶ 10.)

Pinkney claims that the other man was a brief acquaintance named "Vel," and that they had a dispute in front of the school over some money that Pinkney had given to Vel for a ride. (Pinkney Dep. 57.)  The dispute grew heated and Pinkney took Vel's car keys, resulting in some grappling in front of the school.  (Pinkney Dep. 72-77.)  At some point Pinkney threw Vel's keys into the front seat of Vel's car, which resulted in Vel producing a stick and ordering Pinkney out of the car.  (Pinkney Dep. 85-95.)  Apparently Pinkney was never hit with the stick, but some more wrestling occurred outside of the car.  (Pinkney Dep. 85-95.)  Pinkney claims that during the struggle, he called out to a bystander more than once, "Call the police.  This guy is robbing me."  (Pinkney Dep. 75, 80, 82.)  According to Pinkney, Vel was the aggressor and Pinkney gave up once he saw that Vel had a bat.  (Pinkney Dep. 92-94.)

After Vel drove off, Pinkney observed Peconge approaching him.  (Pinkney Dep. 94-95.)  Pinkney claims that he approached Peconge (who, due to his uniform, appeared to be a fireman), and said, "Did anybody hear me calling for the police?  This guy just robbed me." (Pinkney Aff. ¶ 2; Pinkney Dep. 95.)  Pinkney claims that Peconge responded, "Now you know that I cannot have you fighting in front of my school."  (Pinkney Aff. ¶ 3.)  At that point, Pinkney thought that Peconge was accusing him of something, so he began to walk away.  (Pinkney Aff. ¶ 4.)  As he was walking away, Pinkney observed a police officer (who he later learned was Thomas) drive up in a squad car.  (Pinkney Aff. ¶ 5; Pinkney Dep. 97.)  Pinkney decided that he did not want to talk to the police and to keep on walking, apparently because he knew he would end up getting arrested.  (Pinkney Dep. 97-100.)

Pinkney heard Peconge and Thomas say something to each other, and Peconge claims that he simply told the police officer that Pinkney had just reported being robbed.  (Pinkney Aff. ¶ 6; Peconge Aff. ¶¶ 10-15.)  In any event, Pinkney claims that Thomas yelled to him, "Hold it

right there."[1]  (Pinkney Dep. 100-01.)  At about this time, Peconge started to chase Pinkney and then Pinkney saw Thomas reach for his weapon.  (Pinkney Aff. ¶ 6.)  At that point, Pinkney began to run away.  (Pinkney Aff. ¶ 6.)

Pinkney ran across the street and down an alley, where he tried to jump a chain link fence.  (Pinkney Dep. 107-08.)  Pinkney claims that as he tried to jump the fence, Peconge (who was ahead of Thomas throughout the chase) caught up to him and grabbed his left arm with both hands, seizing him.  (Pinkney Dep. 108.)  Pinkney claims that he did not resist and in fact, "just turned and looked," and almost instantaneously Thomas arrived and began hitting him in the face with his fist.  (Pinkney Dep. 108.)  Pinkney claims that Thomas hit him three times or more in "[j]ust a couple of seconds[,]" and that it "happened really quick," at about the same time as Peconge caught his left arm.  (Pinkney Dep. 138-39).  Pinkney then complied with Thomas's order to get on his knees and was hand-cuffed.  (Pinkney Dep. 110-11, 138-39.)

Pinkney admits that neither he nor Peconge had any notice or notion that Thomas was going to hit him and is uncertain whether Peconge had an opportunity to stop Thomas's blows.  (Pinkney Dep. 138-39.)

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P 56(c).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the

---

[1]    After this point in the story Peconge offers an entirely different recitation of the facts, but it is not recounted here since we must accept Pinkney's version on summary judgment.  *See, e.g., Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 127 S.Ct. 1769, 1776 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)).

## IV. DISCUSSION

### A. *Pinkney's Common Law Battery Claim Survives Summary Judgment.*

Peconge maintains that Pinkney's state law battery claim fails as a matter of law because: 1) Pinkney has not shown a necessary element, that Peconge intended to harm him; 2) the physical contact with Pinkney was privileged and lawful because Peconge was entitled to assist Thomas in the apprehension of Pinkney; and 3) Peconge was acting within the scope of his employment with FWCS and is therefore immune from liability under Indiana's Tort Claims Act, Ind. Code § 34-13-3 *et seq*.

In turn, Pinkney disputes Peconge's claim of immunity, maintaining that a jury could conclude that Peconge chased and grabbed him with the intention of rendering him defenseless against Thomas's physical onslaught. Pinkney also argues that Peconge's touching was unlawful because he had the right to simply walk away from Peconge and Thomas.

1. <u>Whether Peconage committed a battery, and if so, whether it was privileged, are genuine issues of material fact.</u>

What constitutes a civil battery is well established. "An actor is subject to liability to

another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." *Mullins v. Parkview Hosp., Inc.*, 865 N.E.2d 608, 610 (Ind. 2007) (citing *Restatement (Second) of Torts* § 13 (1965)).

Accordingly, Peconge is liable for a simple battery if he "intentionally causes bodily contact to the plaintiff in a way not justified by the plaintiff's apparent wishes or by a privilege, and the contact is in fact harmful or against the plaintiff's will." 1 D.B. Dobbs, *The Law of Torts* § 28, at 52-53 (2001). On this record, of course, it can certainly be inferred that Peconge was acting with the knowledge that his touching of Pinkney was inconsistent with Pinkney's wishes, that is, "offensive," given that Pinkney was clearly attempting to avoid any contact. *Id*. § 29, at 55 ("[A] touching is 'offensive' if it infringes upon the plaintiff's actual and apparent wishes to avoid it.").

Peconge seemingly suggests that the real harm to Pinkney came from Thomas, and not from Peconge's rather benign two-handed grabbing of Pinkney's left arm. (*See* Peconge Br. 12.) *See, e.g., Mullins*, 865 N.E.2d 608 (affirming summary judgment for the defendant health care providers because the plaintiff had not alleged that they intended to cause harm, even though it was conceded that a harm (a lacerated esophagus), directly resulted from the touching (an intubation)). This argument, however, ignores that according to Pinkney, by the time Thomas arrived, Peconge had already committed a simple battery by grabbing Pinkney, and a jury could infer a corresponding intent to violate Pinkney's right to himself, *see* 1 Dobbs, *supra*, § 29, at 55, an issue that *Mullins* does not reach.

Peconge asserts, however, that even if a technical battery occurred, the touching was justified, *see id*. § 28, at 53, because of a legal privilege. This argument takes a number of forms

but emanates from the simple principle that Peconge was legally entitled to assist Thomas in Pinkney's arrest.

The first iteration of the argument centers on the privilege that any regular citizen has when that person effectuates a citizen's arrest for a misdemeanor involving a breach of peace committed in his presence and if necessary to prevent its continuation. *See* Ind. Code § 35-33-1-4(a)(3). Towards that end, Peconge argues that Pinkney breached the peace in two ways: first, by fighting outside the school; and second, by fleeing after Thomas commanded him to stop, thus committing the Class A misdemeanor of Resisting Law Enforcement under Indiana Code § 35-44-3-3(a)(3).

The problem with the first theory, that Pinkney breached the peace by fighting, is that while that may have been the case, none of that occurred in Peconge's presence[2] as the statute requires. Ind. Code § 35-44-3-3(a)(3). There is also certainly no evidence that Pinkney's arrest was necessary to "prevent the continuance of the breach of peace" since the other participant, "Vel," had left the scene. *See* Ind. Code § 35-33-1-4(a)(3). The theory is also ham-strung by the factual record, which, viewed in Pinkney's favor, suggests that he had not actually been in a fight but was in fact a crime victim.

Peconge's second breach of peace argument does have some factual basis in that Pinkney admits he heard officer Thomas yell, "Hold it right there," yet ran away. Indeed, Indiana Code § 35-44-3-3(a)(3) provides that:

---

[2]     In at least one jurisdiction, the term "in the presence" has been given a liberal construction so that in connection with employment duties, the knowledge of one citizen is imputed to those who act in concert with her to effect the arrest. *Rife v. D.T. Corner, Inc.*, 641 N.W. 2d 761 (Iowa 2002) (extending the shared-knowledge doctrine to a citizen's arrest). The Indiana Supreme Court has not employed this approach.

A person who knowingly and intentionally[] flees from a law enforcement officer after the officer has, by visible or audible means, identified himself and ordered the person to stop; commits resisting law enforcement, a Class A misdemeanor.

Indiana Code § 35-44-3-3(a)(3).

The issue, however, is as Peconge recognizes, whether the offense of resisting law enforcement necessarily involves a breach of peace so as to allow a citizen to effectuate an arrest under Indiana Code § 35-33-1-4(a)(3). On that score, although the actual limits on what may constitute a breach of the peace are not always well defined, the Indiana Supreme Court has held that it is "Hornbook law" that violence, either actual or threatened, is an essential element. *Lemon v. State*, 868 N.E. 2d. 1190, 1194 (Ind. 2007) (citing *Price v. State*, 622 N.E. 2d 954, 960 n.6 (Ind. 1993)). Sections 116, 119, and 141 of the *Restatement (Second) of Torts* are in accord with this view.

Thus, putting this legal standard next to the facts viewed in a light most favorable to Pinkney, it instantly becomes clear that Peconge did not witness a breach of the peace such that he was privileged under Indiana Code § 35-33-1-4(a)(3) to effectuate, on his own, a citizen's arrest.[3]

Finally, Peconge argues that even if he is not entitled to a privilege for acting on his own, his acts were nonetheless privileged because he was lending aid to a police officer, Thomas, who was lawfully performing his duties; in short, Peconge argues that he is entitled to the same justifications surrounding the arrest as Thomas. (Peconge Br. 15-17 (citing *Goodwine v. Stephens*, 63 Ind. 112 (Ind. 1878)). This proposition is indeed long-standing, and as the Indiana

---

[3]     Notably, Thomas charged Pinkney with Resisting Law Enforcement under Indiana Code § 35-44-3-3(a)(3) for fleeing, not under the other two sections of subsection (a) which describe forcible resistance and which could, therefore, arguably support the position that resisting law enforcement constitutes a breach of peace.

Supreme Court observed in *Goodwine*, citizens have a legal duty to obey the call of a law enforcement officer in the need of assistance in the execution of his office; in fact, now as in 1878, refusing to aid an officer is a misdemeanor. *See* Ind. Code § 35-44-3-7. Along those same lines, the *Restatement (Second) of Torts* section 139 provides that an actor is privileged to use force against another for purposes of assisting a police officer making an arrest if the officer is likewise privileged to make the arrest.

It is at this point that Pinkney's argument that he, as a citizen, had a right under the Fourth Amendment to simply walk away from Thomas, deserves discussion. In essence, Pinkney argues that under the totality of the circumstances, neither Thomas or Peconge had "reasonable suspicion" to think that he had engaged in any criminal activity, and correspondingly, they had no reason to order him to stop, or to chase and seize him when he ran. (Resp. Br. 5.)

Pinkney's principal case on this score is *Greeno v. State*, 861 N.E.2d 1232 (Ind. Ct. App. 2007). In *Greeno*, the police responded to an anonymous phone call and upon arrival noted an individual sitting outside. The officer approached to inquire if he was the person the tipster had mentioned, but Greeno quickly walked into a building, despite the officer's pursuit and demand that he "stop." Greeno was never charged with resisting law enforcement, and the resulting warrantless search was held to be improper because the police officer did not have reasonable suspicion that Greeno engaged in or was about to engage in criminal activity before pursuing him and ordering him to stop. In short, Greeno was free to ignore the police officer and simply walk away. *Id.* at 1233.

*Greeno* is readily distinguishable, however, because in this instance, Thomas arrived on the scene after a reported fight outside the school (*see* Thomas's Probable Cause Aff.) and was

met by the uniformed Peconge. Peconge then pointed out Pinkney, who by then was walking away, as someone who had just claimed to be a robbery victim. No doubt Thomas reasonably viewed Pinkney's retreat from police presence as a bit suspicious for an alleged crime victim and decided that there might be more to the tale; he had at least enough reasonable suspicion to conduct a brief investigatory stop, *see Terry v. Ohio*, 392 U.S. 1, 30 (1968), and immediately ordered Pinkney to "Hold it right there."[4] Pinkney's response to the stop order was even more unusual for an alleged crime victim – he fled – clearly giving Thomas probable cause now to believe that a criminal offense, Resisting Law Enforcement, a Class A misdemeanor under Indiana Code § 35-44-3-3(a)(3), had just been committed, and authorizing an arrest. *See Cole v. State*, 878 N.E. 2d 882, 887 n.5 (Ind. Ct. App. 2007) (distinguishing *Greeno*).

The significance of this conclusion is a bit unclear under Indiana law, as the Court could find no authority on point, but the *Restatement (Second) of Torts* provides guidance. In sum, because Thomas was now privileged to use reasonable force to arrest Pinkney, Peconge would be similarly privileged to the extent he was assisting Thomas. *See Restatement (Second) of Torts* § 139(a) (1965). The privilege applies, however, only if Peconge had reason to believe that Thomas could not make the arrest without his assistance. *See Restatement (Second) of Torts* § 139(a), cmt. b.3 (1965). There is, of course, no evidence that Thomas ever requested Peconge's assistance, and moreover, the facts Pinkney supplies at least raise the inference that Peconge actually took off ahead of Thomas, leading the chase with Thomas behind. The legal effect of

---

[4]     In particular, Peconge had just told Thomas that Pinkney was a self-reported robbery victim, and thus Thomas was entitled to inquire of Pinkney about that event. *See Illinois v. Lidster*, 540 U.S. 419, 425 (2004) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions.")

such an inference is that a jury could conclude that rather than Peconge assisting Thomas, Thomas was assisting Peconge; in such a case Peconge did not have a privilege to touch Pinkney, either on his own as discussed earlier, or in assisting Thomas. *See id.* Consequently, this circumstance presents an issue of material fact that a jury needs to resolve.

2.    A jury could find Peconge liable for the entire harm suffered by Pinkney.

This still leaves the question, however, of whether Peconge can be held liable for Thomas's blows to Pinkney's face. One possible argument, although Pinkney does not make it expressly, is that Peconge is liable because he aided and abetted in the attack. *Mock v. Polley*, 66 N.E.2d 78, 81 (Ind. Ct. App. 1946) (holding that one aiding and abetting a battery is "equally guilty" and liable in tort). Since *Mock*, Indiana courts have adopted section 876 of the *Restatement (Second) of Torts* concerning aiding and abetting and concerted action generally for both intentional torts and negligence actions. *Boyle v. Anderson Fire Fighters Ass'n*, 497 N.E.2d 1073, 1079 (Ind. Ct. App. 1986) (citing *Restatement (First) of Torts* § 876 (1939)); *Hellums v. Raber*, 853 N.E. 2d 143, 146 (Ind. Ct. App. 2006) (applying the *Restatement (Second) of Torts* § 876 (1965) to a negligence action). That section of the Restatement states:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Viewed through the prism of clause (c) of this section of the *Restatement (Second) of Torts*, as well as § 875 generally, Peconge is liable for the entire harm suffered by Pinkney if he gave "substantial assistance" to Thomas, since, as we have already determined, a jury could deem his conduct, separately considered, to be a battery. The question presented thus becomes:

11

did the grabbing of Pinkney's left arm by Peconge give "substantial assistance" to Thomas in accomplishing the strikes to Pinkney's face?

Of course, "[w]hat counts as substantial aid or encouragement no doubt depends heavily on the facts." 2 Dobbs, *supra*, § 340, at 938. Here, a jury could conclude that by grabbing Pinkney's left arm and positioning him, Peconge made it possible for Thomas to repeatedly strike blows to Pinkney's face, as otherwise Pinkney might have been able to move or deflect the strikes. In addition, because Peconge became involved in the pursuit and apprehension, a jury could conclude that this encouraged Thomas to hit Pinkney, either out of a sense of malice or because he felt the strikes were necessary to protect Peconge. *See Hellums*, 853 N.E. 2d at 146-47. Accordingly, a jury question as to these facts arises as well.

3. <u>A jury could conclude that Peconge acted outside the scope of his employment and not for FWCS.</u>

Finally, we reach Peconge's assertion that because he was acting within the scope of his duties as a security guard for FWCS when he chased and grabbed Pinkney, he cannot be held liable as a matter of law under Indiana's Tort Claims Act, Ind. Code § 34-13-3 *et seq.*[5] Indeed, as Indiana Code § 34-13-3-5(b) provides: "[a] lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally." *See also* Ind. Code § 34-13-3-5(c).

Peconge comes at the question two ways: he first argues that as a security guard for FWCS, the chasing and apprehension of criminals is part of his job description; and second, he points to the opinions of Weicker and Sleet as evidence that FWCS ratified his conduct.

---

[5]    Although the parties stipulate that Peconge was acting within the scope of his employment when he came in contact with Pinkney, see Proposed Pretrial Order p. 6, ¶ F. 2., this apparently means when they first met and *not* when Peconge commenced an off-premises pursuit.

a.     A reasonable jury could conclude that Peconge was not acting within the scope of his duties when he left the school premises to chase and grab Pinkney.

Peconge's first point has some superficial appeal because "[i]t is settled law that the Indiana Tort Claims Act shields a government employee from liability for tortious conduct if the employee was acting within the scope of his . . . duties." *Hunt v. Indiana Family & Soc. Servs. Admin.*, No. 1:05-cv-0604-JDT-WTL, 2007 WL 2349626, at *14-15 (S.D. Ind. Aug. 1, 2007) (citing *Bushong v. Williamson*, 790 N.E.2d 467, 472 (Ind. 2003) (interpreting Indiana Code §§ 34-13-3-3 and 34-13-3-5(b) as extending a general grant of personal immunity to government employees acting within the scope of their duties)).

Even allegations of criminal conduct, something Pinkney alleges by citing the criminal battery statute, Ind. Code § 35-42-2-1(a), is not dispositive of whether Peconge was acting outside the scope of employment. *Bushong*, 790 N.E. 2d at 473. Rather, "conduct ... of the same general nature as that authorized, or incidental to the conduct authorized," is within the employee's scope of employment. *Id.* (citing *Celebration Fireworks, Inc. v. Smith*, 727 N.E.2d 450, 453 (Ind. 2000) (quoting *Restatement (Second) of Agency* § 229 (1958)). As the Indiana Supreme Court noted in *Bushong*, "[a]n act is incidental to authorized conduct when it 'is subordinate to or pertinent to an act which the servant is employed to perform," *id.* (quoting *Restatement (Second) of Agency* § 229 cmt. b (1958)), or when it is done "to an appreciable extent, to further his employer's business[,]" *id.* (quoting *Kemezy v. Peters*, 622 N.E.2d 1296, 1298 (Ind. 1993)). Consequently, "[e]ven criminal acts may be considered as being within the scope of employment if 'the criminal acts originated in activities so closely associated with the employment relationship as to fall within its scope.'" *Id.* (quoting *Stropes v. Heritage House*

*Childrens Ctr. of Shelbyville, Inc.*, 547 N.E.2d 244, 247 (Ind. 1989)). Generally, whether the tortious act of an employee is within the scope of employment is a question of fact. *Id.*

Notwithstanding that the question is usually one for the jury, Peconge argues that he is entitled to summary judgment because he was clearly acting within the scope of his employment as a security guard when he approached Pinkney at the site of the alleged fight, a school bus boarding zone, and perhaps too when he reported Pinkney's claim of being a robbery victim to Thomas.

A jury, however, could reasonably infer on this record, and based on the factors cataloged in the *Restatement (Second) of Agency* §§ 228-29, that Peconge acted outside the scope of his employment when he undertook to chase and grab Pinkney. After all, there is nothing in the record to suggest that he was employed by FWCS to provide police back-up well off school grounds, particularly to help in the apprehension of a misdemeanent who was fleeing *away* from the school. Moreover, although Peconge now argues in support of his motion that he was motivated at least in part to protect the school (Peconge Br. 10), that does not appear in his affidavit (*see* Peconge Aff. ¶ 17) and thus a jury could reject this unsupported suggestion of mixed motives. *Restatement (Second) of Agency* § 235, cmt. b. (1958). And although we cannot tell from the record how far away from the school Peconge actually chased Pinkney or how long it took, it appears that Peconge was clearly away from the school "building[] and grounds[,]" his area of responsibility and where he was authorized to act. (*See* Weicker Aff. Ex. A (setting forth the Security Guard job description)); *see also Restatement (Second) of Agency* § 234, cmt. d (1958) ("[A]n intentional departure from the premises, even for a comparatively slight distance, would remove the servants so acting from within the scope of employment . . . ."). Thus,

14

overall, whether Peconge was acting within or outside the scope of his employment when he pursued Pinkney remains an issue of fact.

      b.      Peconge's acts of chasing and grabbing Pinkney have not and cannot be ratified.

Finally, we face Peconge's alternative argument that the statements of Weicker and Sleet, (Weicker Aff. ¶ 17; Sleet Aff. ¶ 16), both of whom offer the opinion that what Peconge did was "within the scope of his duties," means that his actions have now been ratified, and that as a consequence he has no personal liability under Indiana Code § 34-13-3-5(c).[6] (*See* Peconge Reply Br. 10 (citing *Lee v. United States*, 171 F. Supp. 2d 566, 577 (M.D. N.C. 2001) (finding that Postal Service plant manager's affidavit ratifying a battery supports a finding that the employee was acting within the scope of his employment). Peconge's argument is both factually and substantively flawed.

More specifically, ratification requires that the one who acts without authority (*i.e.*, Peconge) must have, at the time, professed that he was purporting to act as agent for, or on behalf of, the one subsequently ratifying the act. 1 *Ind. Law Encycl. Agency* § 121 (2008); 3 *Am. Jur. 2d Agency* § 188; *Restatement (Second) of Agency* § 85 (1958). Here, as noted earlier, while there is a question of fact whether Peconge was acting for or on behalf of FWCS or on his own when he took off after Pinkney, it does seem clear that he never expressed at, during, or immediately afterwards that his chasing of Pinkney was for or on behalf of FWCS. Accordingly, his actions are not something his employer, FWCS, can ratify.

---

[6]      The opinions expressed by Weicker and Sleet about whether Peconge's actions were appropriate and within the scope of his duties may not actually be admissible under Federal Rule of Evidence 701 since they do not appear to be based on their own perceptions or particularly helpful to the determination of a fact at issue. The Court will nevertheless consider them here since Pinkney did not file a motion to strike them.

There is also another problem with the proposed ratification. Unlike the situation in *Lee*, 171 F. Supp 2d. at 577, where the Postal Service manager based his statement on what the plaintiff was alleging in his complaint, Weicker and Sleet presume to ratify Peconge's actions based solely upon what he told them and not upon a reading of Pinkney's Second Amended Complaint. This lack of full knowledge renders the purported ratification ineffective. 1 *Ind. Law Encycl. Agency* § 122 ("Full knowledge by the principal of all material facts is generally indispensable to ratification.").

Finally, Peconge faces a fundamental problem: any affirmance of an agent's prior act must come from the purported agent's principal. *Restatement (Second) of Agency* § 82 (1958). According to the job description, however, it appears that *FWCS* is that principal, and *not* Weicker or Sleet (*see* Weicker Aff. Ex. A), and although Peconge may have been "responsible to" the Director of Security (*i.e.*, Weicker) and the Unit Head (*i.e.*, Sleet), there is no showing that either one was ever authorized by FWCS to affirm Peconge's acts. *Restatement (Second) of Agency* § 93(3) (1958) ("The affirmance can be made by an agent authorized so to do."). Stated somewhat differently, neither Weicker or Sleet can bind FWCS by ratifying Peconge's acts since there is no showing that they, either as employees or agents of FWCS, had the power to appoint him. *Thompson v. Michigan Mut. Life Ins. Co.*, 105 N.E. 780 (Ind. Ct. App. 1914); 1 *Ind. Law Encycl. Agency* § 58 (2008) ("An agent who has no power to appoint a subagent cannot ratify the act of a subagent so as to bind the principal.").

      c.      In any event, ratification has no apparent applicability to Indiana tort immunity.

Aside from the fact that no ratification has occurred, Peconge's argument that if it did occur it would ineluctably lead to immunity under Indiana's Tort Claims Act, Ind. Code § 34-13-3 *et seq.*, seems misplaced. After all, Peconge bases his argument solely on *Lee*, and its rather

truncated discussion of that agency principle. *See Lee*, 171 F. Supp. 2d at 577, n.8. Stated most simply, that District Court applied ratification under North Carolina law as "an alternative basis of [vicarious] liability to scope of employment." *See, e.g.*, 27 *Am. Jur. 2d Employment Relationships* §§ 459-60. Otherwise, the case centers on a discussion of North Carolina law as applied to the Westfall Act amendment, 28 U.S.C. § 2679(d)(1), to the Federal Tort Claims Act. *Lee*, 171 F. Supp. 2d at 572-73.

This Court, on the other hand, must apply Indiana law. Under the Indiana Tort Claims Act, Ind. Code § 34-13-3-5(b), immunity extends only to those employees who "acted within the scope of the employee's employment," (*i.e.*, a *respondeat superior* theory of liability) and there is no mention of any alternative basis for vicarious liability, or immunity, such as a government principal's purported ratification of an agent's wrongful conduct. Consequently, Peconge's ratification theory is seemingly inapplicable and he is not entitled to summary judgment on that basis.

### B. *Pinkney's § 1983 Claim Also Withstands the Motion for Summary Judgment*

To prevail on his § 1983 excessive force claim, Pinkney must prove that Peconge: (1) acted under color of state law, a point that is undisputed; and (2) deprived Pinkney of some right under the Constitution or the laws of the United States. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 931 (1982); *Ineco v. City of Chicago*, 286 F.3d 994, 997-98 (7th Cir. 2002); *Harbours Pointe of Nashotah, LLC v. Vill. of Nashotah*, 278 F.3d 701, 704 (7th Cir. 2002). Although Pinkney offers three separate theories in support of his claim of excessive force under the Fourth Amendment, only one has any viability.

1. Peconge and Thomas were not joint constitutional tortfeasors on the excessive force claim.

Although Pinkney offers a conclusory assertion that Peconge and Thomas are joint constitutional tortfeasors who acted in concert and caused one indivisible injury, this theory is unavailing since the record does not establish either a conspiracy or such an injury. *Harper v. Albert*, 400 F.3d 1052, 1062 (7th Cir. 2005). Stated another way, for such a claim to hold water, Pinkney would have show that both Thomas and Peconge visited some manner of wrong (a constitutional violation) on him. *Id.* And though Peconge arguably failed to intervene, as discussed later, that is a different theory of liability than the exercise of excessive force, *id.*, and there is no showing that Peconge's force, the grabbing of Pinkney's arm, was "excessive . . . [as] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989); *see also Scott v. Harris*, 127 S.Ct. 1769, 1776 (quoting *Graham*). In *Scott*, the Court explained that "[a]t the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record . . . the reasonableness of [the officer's] actions . . . is a pure question of law." *Id.* Consequently, although Peconge's grabbing of Pinkney may have technically been a state law battery, it was not objectively unreasonable force under the Fourth Amendment as a matter of law.

2. Peconge did not create or increase the danger to Pinkney.

Pinkney offers another argument that fails, that Peconge actually created or increased the danger to him because by restraining him, Peconge actually made him more vulnerable to excessive force from Thomas. (*See* Resp. Br. 8 (citing *Monfils v. Taylor*, 165 F. 3d 511, 516 (7th Cir. 1998); *Reed v. Gardner*, 986 F. 2d 1122, 1126 (7th Cir. 1993)). A proper formulation of the doctrine is "that liability exists when the state affirmatively places a particular individual

in a position of danger the individual would not otherwise have faced." *Escobedo v. City of Fort Wayne*, No. 1:05-CV-424-TS, 2008 WL 4055828, at * 9 (N.D. Ind. Aug. 29, 2008) (citing *Monfils*, 165 F.3d at 516) (internal quotations omitted).

In *King ex rel. King v. E. St. Louis Sch. Dist.*, 189, 496 F.3d 812, 817 (7th Cir. 2007), the Seventh Circuit identifed three principles that govern the analysis of the state-created danger doctrine. First, in order for the Due Process Clause to impose upon a state the duty to protect its citizens, the state, by its affirmative acts, must create or increase a danger faced by an individual. *Id*. at 817-18 (citations omitted). Second, the failure on the part of the state to protect an individual from such a danger must be the proximate cause of the injury to the individual. *Id*. Third, because the right to protection against state-created dangers is derived from the substantive component of the Due Process Clause, the state's failure to protect the individual must shock the conscience. *Id*. The Seventh Circuit has also said that cases addressing this issue "suggest that the key question in determining whether state behavior violated the victim's constitutional rights is: 'What actions did [the state actor] affirmatively take, and what dangers would [the victim] otherwise have faced?'" *Escobedo*, 2008 WL 4055828, at *9 (citing *Windle v. City of Marion, Ind.*, 321 F.3d 658, 661 (7th Cir. 2003) (quoting *Monfils*, 165 F.3d at 517)). Furthermore, "cases in which we have either found or suggested that liability attaches under the 'state-created danger' exception are rare and often egregious." *Id*. (citing *Estate of Allen v. City of Rockford*, 349 F.3d 1015, 1022 (7th Cir. 2003)).

With these authorities in view, it instantly becomes clear that Pinkney does not have a claim under this doctrine. There is no showing, for instance, that Peconge created or increased a danger that Pinkney was not already facing, given that he was actively fleeing from a police officer who by that time was entitled to use, under *Graham*, objectively reasonable force.

Moreover, no reasonable jury could conclude that either Peconge's grabbing or holding of Pinkney was the proximate cause of the injury which by all accounts stemmed from Thomas's repeated strikes to Pinkney's face. And finally, even if Peconge halted Pinkney's flight by grabbing his arm and then rotated him to one side, this conduct does not shock the conscience as a matter of law.

   3.   Whether Peconge failed to prevent Pinkney's injury is an issue of fact for the jury.

The only viable claim that Pinkney offers is whether Peconge knew that Thomas was going to beat Pinkney (that is, at least after the first strike), and had a realistic opportunity to do something to prevent that harm from occurring, yet failed to take reasonable steps to do so. *See Lanigan v. Village of East Hazel, Ill.*, 110 F.3d 467, 477-478 (7th Cir. 1997); *Yang v. Hardin*, 37 F. 3d 282, 285 (7th Cir. 1994). Pinkney argues that at the very least Peconge should have cautioned Thomas to stop the hitting. (*See* Resp. Br. 9 (citing *Abdullahi v. City of Madison*, 423 F. 3d 763, 774 (7th Cir. 2005)).

Notably, Peconge does not respond that Thomas's use of force was objectively reasonable, *Graham*, 490 U.S. at 388; rather, he simply assets that he did not know that Thomas was going to hit Pinkney, and because it happened so fast, he had no realistic opportunity to stop or prevent it. *See Yang*, 37 F.3d at 285. On that score, however, Peconge has a steep uphill climb on summary judgment given that the Seventh Circuit has emphasized that the prongs of this analysis typically implicate questions of fact – that is, "'[w]hether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury *could not possibly conclude otherwise*.'" *Id.* (quoting *Lanigan,* 110 F.3d at 478) (emphasis in original).

In this instance, Peconge was clearly present and within an arm's length of both Pinkney

and Thomas. *See Abdullahi*, 423 F.3d at 774. It is also a fair inference that given this proximity to events, he observed the first strike and could have cautioned Thomas against any more. *See Yang*, 37 F.3d at 285 (determining that defendant officer should be liable for damages for failure to intervene where "the facts demonstrate several opportunities during which [defendant] could have acted"). More to the point, on this record, which is viewed in a light most favorable to Pinkney, a reasonable jury could possibly conclude in his favor on this question, meaning that Peconge's motion must be denied.[7]

Accordingly, summary judgment must be denied on Pinkney's Fourth Amendment claim against Peconge to the extent he failed to take reasonable steps to stop Thomas's alleged assault.[8]

## V. CONCLUSION

For the foregoing reasons, Peconge's motion to strike (Docket # 31) is deemed MOOT. Peconge's motion for partial summary judgment (Docket # 20) is DENIED.

SO ORDERED.

Enter for September 17th, 2008.

S/ Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[7] Peconge does not argue the dubious point that as a non-law enforcement officer, and a mere firefighter for the City of Fort Wayne, he had no duty to intervene to stop police officer Thomas. *See Reddick v. Bloomingdale Police Officers*, No. 96 C 1109, 2001 WL 789432, at *10 (N.D. Ill. July 12, 2001) ("There is no support . . . for the limitation . . . that the duty to intervene applies only to police officers.").

[8] Pinkney repeatedly argues that Peconge is not entitled to qualified immunity, but Peconge never raised that issue in the briefing, resting his case instead on the simple proposition that Pinkney has no § 1983 claim as a matter of law. Accordingly, the Court will not reach the issue of qualified immunity.